O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS B. JR.,<br><br>      Plaintiff,<br><br>    v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>      Defendant. | Case No. 2:20-cv-01359-KES<br><br>MEMORANDUM OPINION AND ORDER |

## I.

## BACKGROUND

In September 2016, Carlos B. Jr. ("Plaintiff's") mother applied on behalf of Plaintiff for Supplemental Security Income ("SSI") disability benefits alleging that he became unable to work on October 24, 2014. Administrative Record ("AR") 163-72. On January 7, 2019, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified with the assistance of a Spanish interpreter.[1] AR 47-65. On January 24, 2019, the ALJ issued an unfavorable decision. AR 34-42.

---

[1] Plaintiff was born and raised in the United States where he graduated from high school. He explained that he could speak English, but he preferred Spanish. AR 51-52.

1

The ALJ found that Plaintiff suffered from the medically determinable impairments of "seizure disorder; possible learning disorder versus possible borderline intellectual functioning; and mood disorder." AR 36. The ALJ determined that Plaintiff's mental impairments did not satisfy a Listing. AR 36-37. Despite his impairments, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform medium work with seizure precautions (i.e., "no working around unprotected heights, open bodies of water, and dangerous machinery") and the following additional limitations to account for his mental impairments:

> The claimant is limited to non complex routine tasks, but no tasks requiring hypervigilance, and is not responsible for the safety of others. Further, the claimant is precluded from jobs requiring public interaction, and no fast paced work such as rapid assembly or conveyor belt work.

AR 37.

Plaintiff had no past relevant work. AR 57-58. Based on this RFC and the testimony of a vocational expert, the ALJ found that Plaintiff could work as an industrial cleaner, furniture cleaner, or "Cleaner II." AR 41. The ALJ concluded that Plaintiff was not disabled from the date of his September 2016 application through the date of the ALJ's January 2019 decision. AR 42.

## II.
## ISSUE PRESENTED

Whether the ALJ erred in evaluating the September 2018 medical source statement ("MSS") of treating physician Frederick Thomas, M.D., at AR 619-22. (Dkt. 24, Joint Stipulation ["JS"] at 4.)

## III.

## DISCUSSION

A. **Law.**

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Turner v. Comm'r of SSA, 613 F.3d 1217, 1222 (9th Cir. 2010) (citation omitted). This rule, however, is not absolute. Where, as here (see AR 75, 580-83), "a nontreating source's opinion contradicts that of the treating physician . . . the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citation omitted).[2]

B. **Summary of the Medical Evidence.**

Because Plaintiff applied for SSI benefits, the relevant period for establishing disability began at the time of his application on September 30, 2016. 20 C.F.R. § 416.335. For context, however, the Court has summarized all the AR's medical records.

**1. Childhood through 2014.**

Plaintiff was born in February 1976. AR 410. He suffered from seizures since contracting meningitis at about the age of one.[3] AR 53, 410. He had a ventricular shunt installed to treat brain swelling. AR 673.

In 2014, he reported that a jail physician five years earlier had started him on Keppra (brand name for levetiracetam), which had helped control his seizures. AR 308. Shortly after being released from prison in 2014, he had a series of visits to

---

[2] This case law applied regulations in place for applications filed before March 27, 2017. As Plaintiff's application was filed in 2016, the Court need not apply the new regulations to Plaintiff's claim.

[3] Elsewhere, he stated that his seizures started at about the age of 14. AR 308.

hospital emergency rooms complaining of chest pain, headaches, and seizures. See AR 676, 688 (8/22/14 admit date at Downey Regional Medical Center ["Downey"] which prescribed anti-seizure medication), AR 640 (9/6/14 admit date at Downey). The ER staff noted that since his release from prison, he had "not established … new MD" to refill his prescriptions. AR 647. He was given Dilantin (brand name for phenytoin) and counselled to follow up with a primary care doctor. AR 647-48.

Just one day later on September 7, 2014, Plaintiff was admitted to the Cedars-Sinai ER complaining of headaches. AR 252-53, 344.[4] Lab tests showed a low phenytoin level of 2.0, and he received more Dilantin. AR 275, 346-47. Plaintiff returned to the Cedars-Sinai ER on September 9, 2014, where he was vomiting on arrival. AR 252-53. He reported taking Dilantin regularly and not suffering a seizure for 5 days, but his phenytoin level was still low at 5.1. AR 255, 265, 272-73; see also AR 289 (9/14/14 admit date at Cedars-Sinai ER).

Plaintiff established regular treatment at Cedars-Sinai through the rest of 2014. Those records show that Plaintiff had a low phenytoin level of 2.0 on September 19, 2014. AR 302. He started taking Depakote (brand name for valproic acid or VPA) to address his headaches and seizures. AR 312. By October, his doctors had developed a plan to discontinue Dilantin over three weeks. AR 302. His VPA level in October was 70, which is in the therapeutic range for epilepsy. AR 305, 312, 348. By November, he was reporting 5-10 seizures per month. AR 304. By December 2014, his phenytoin level was 2.0 (apparently consistent with discontinuing Dilantin) and his VPA level was 70, but

---

[4] During this September 2014 visit, Plaintiff stated that seven years earlier he had quit drugs and alcohol. AR 253. He had been at that time drinking 18 beers a day and taking cocaine, crack, and marijuana. Id. In October 2014, he reported drinking alcohol every week. AR 574. At the hearing, he denied ever having used alcohol or non-prescribed drugs. AR 50-51.

he had another ER visit at Cedars-Sinai. AR 306-07, 452. He was still reporting "frequent breakthrough seizures but does not keep a log." AR 307. His doctor recommended that he keep a seizure log, but the administrative record does not contain one. AR 308, 623.

In connection with a prior application for disability benefits, Plaintiff attended psychological and internal medicine consultative examinations. AR 573, 581. He reported experiencing seizures 2-3 times per week. AR 581.

### 2. 2015.

In January 2015, Plaintiff had his initial visit with the Central Neighborhood Health Foundation ("CNHF") and reported that his primary care physician was at Cedars-Sinai. AR 450. He returned for a physical in February, at which point CNHF ordered lab work and sought a referral to a "neurologist ASAP." AR 453. The same request was repeated in March (AR 455) and April (AR 457). In April, CNHF requested lab work to determine Plaintiff's Keppra and Depakote levels "stat." AR 457; see also AR 461, 466, and 448 (showing high VPA level in April, normal Depakote level in July, low VPA level in August).

In April, Plaintiff started seeing a neurologist, Munther Hijazin, M.D., who took over management of Plaintiff's anti-seizure medications. AR 458-59. In May, July, and August 2015, Plaintiff received medication refills from CNHF. AR 460, 464, 470. CNHF continued to request lab work to determine the level of medications in Plaintiff's blood and, as a result of test results in September, administered extra VPA tablets. AR 471, 475. In October 2015, Dr. Hijazin advised him to increase his dosage of Depakote. AR 440. In December 2015, he had another blood draw to assess his medication levels. AR 439.

### 3. 2016.

Plaintiff continued under the care of both his neurologist and CNHF. AR 428-31 (CNHF appointments from May-August 2016). On June 1, 2016, CNHF referred him to the ER due to "uncontrolled seizure with hypoglycemia." AR 394,

420.

On June 15, 2016, Plaintiff visited Dr. Hijazin. Plaintiff reported having seizures "a few times a month," but Dr. Hijazin noted that he was a "poor historian" who could not provide medical records, and his seizure disorder was "not well controlled." AR 506-07, 566-67. Dr. Hijazin increased Plaintiff's dosage of Depakote. AR 507.

Plaintiff saw CNHF on August 3 and 17, 2016. AR 421, 428. He reported that his last seizure had occurred in July. AR 421. On August 19, 2016, however, Plaintiff went to the ER reporting several recent seizures. AR 410, 630. Although he reported taking his medications as prescribed, his Dilantin level was less than 2.5 and he was diagnosed with a "subtherapeutic dilantin level." AR 632, 410-12.

In September 2016, CNHF noted, "He isn't to [sic] medications," and Dr. Hijazin adjusted his medications. AR 564. Lab work from November 2016 showed "no Dilantin" but "Depakote OK." AR 517-18.

### 4. 2017.

In January 2017, CNHF noted a "need to obtain blood work" to ascertain Plaintiff's medication levels. AR 562. In February 2017, Plaintiff underwent a psychiatric consultative examination, reporting his anti-seizure medications. AR 553. The examiner found that Plaintiff had "poor effort" during the examination and a "lack of cooperation with testing." AR 554.

In March 2017, Dr. Hijazin opined, "he is doing very well on fycompa [brand name for perampanel]; he is able to tolerate well but he still having breakthrough seizures and his medication level are subtherapeutic." AR 560; AR 561 ("noncompliant with medication"). Dr. Hijazin also noted that Plaintiff was "an excellent candidate for VNS [vagus nerve stimulation] but he refused." AR 561.

In May 2017, Dr. Hijazin assessed that Plaintiff was doing "about the same" but Plaintiff still wanted only "conservative care." AR 701-02. On September 18,

2017, CNHF recorded that Plaintiff has a seizure "yesterday," noting "Dilantin level." AR 611.

### 5. 2018.

In January 2018, CNHF noted "breakthrough sz [seizure] off rx [prescription]." AR 607. In February, Dr. Hijazin increased Plaintiff's Fycompa and again recommended VNS. AR 705. After watching a video about VNS, Plaintiff reported that he still "wanted to think about it." AR 707. By April, Plaintiff had "improved" with Fycompa, and he chose to "continue conservative treatment" rather than pursuing VNS. AR 709.

By May, however, Plaintiff's primary care provider ("PCP") at CNHF, John Rastegar, M.D., noted, "Patient is non-compliant." AR 215, 601. Dr. Rastegar registered frustration, stating "suggests if he [does ]not listen needs to change pcp." AR 601.

Plaintiff continued with the same medications in June (AR 711), but in July, lab work showed a low Dilantin level of 1.24 (AR 716). He continued to have low Dilantin levels in August and September. AR 593 ("Dilantin level subtherapeutic"); AR 591 (same); AR 588 (same).

In October, Dr. Hijazin again noted that Plaintiff was "noncompliant" with his prescribed medications. AR 713. Plaintiff had not been taking his Fycompa and his Dilantin level was "not therapeutic." Id.

C. **The ALJ's Evaluation of Dr. Thomas's MSS.**

On September 28, 2018, CNHF's Dr. Thomas wrote an MSS. AR 619. He had treated Plaintiff in May 2016. See AR 431 (noting increased dosage of VPA and referral to neurologist pending), January 2018 (AR 607 noting "breakthrough sz off rx"), September 2018 (AR 586 noting Dr. Thomas is now "PCP").

Despite Plaintiff being a 42-year-old man with no reported orthopedic

injuries,[5] Dr. Thomas opined that Plaintiff could not lift 10 pounds more than occasionally.  AR 621; compare AR 200 (Plaintiff's friend did not identify "lifting" as an area of difficulty).  Dr. Thomas opined that Plaintiff could not stand longer than 15-20 minutes or sit longer than 30-45 minutes at a time.  AR 620-21.  He opined that Plaintiff could stand/walk for less than 2 hours/day and sit for a total of 2-4 hours/day, implying that Plaintiff would need to spend the remainder of each day lying down.  Id.  Regarding Plaintiff's seizure disorder, he noted, "pt on dual anti-sz regimen w/o complete control."  AR 619.  He also noted, "Pt is unable to consistently adequately sustain ADLs, instrumental ADLs, and mobility required ADLs.  Pt is under neuro psychiatric management for his symptoms as well."  AR 622.  He opined that Plaintiff was "incapable" of even "low stress" work and would need 2 or 3 unscheduled breaks every 2 hours, and he would still miss work more than 4 days each month.  AR 620-21.  He opined that Plaintiff had limitations reaching, handling, and fingering above shoulder level.  AR 621.  If credited, Dr. Thomas's extreme opinions would preclude all work.  AR 63.

The ALJ gave Dr. Thomas's MSS statement "little" weight.  AR 39.  The ALJ noted its extreme nature, limiting Plaintiff to "less than sedentary work," restricting him from even "low stress" work, and finding that Plaintiff would miss work more than 20% of the time.  Id.  The ALJ found these opinions inconsistent with the medial evidence.  Id.  Regarding his mental health, the ALJ noted that Plaintiff had generally normal mental status examinations that did not indicate significant symptoms of anxiety or depression.  Id. citing AR 631 (8/19/16 ER visit noting normal speech, appropriate affect, and cooperative attitude) and AR 707 (2/27/18 neurology appointment noting no dizziness, headaches, or symptoms other than seizures, no medications other than anti-seizure medications, and

---

[5] Plaintiff sought SSI benefits on the basis of "seizures" and a "learning disability."  AR 186.

Plaintiff was able to follow instructions and consider treatment choices).  The ALJ found that Plaintiff's "mood disorder" caused some mild or moderate functional limitations, but the restrictions in the RFC adequately accounted for those limitations.  AR 36-37.  Regarding Plaintiff's seizure disorder, the ALJ noted that Plaintiff had admitted at the hearing that he was non-compliant with his medications.  AR 39.

This last observation was based on Plaintiff's hearing testimony.  Plaintiff initially testified that he was compliant with his medications.  AR 53.  When the ALJ questioned why so many of his treating records found subtherapeutic levels of medication if he was complaint, he admitted that he would "sometimes" forget.  AR 59-60.

D. **Analysis of Claimed Errors.**

Plaintiff argues that the ALJ "failed to articulate a single specific and legitimate reason for rejecting Dr. Thomas's" MSS.  (JS at 7.)  First, Plaintiff argues that the ALJ's finding that Dr. Thomas's MSS was inconsistent with the weight of the medical evidence is not supported by substantial evidence.  (Id. at 6.) Plaintiff points to medical records showing that Plaintiff had significant seizure activity in 2017 and 2018.  (Id. at 6-7.)

While Dr. Thomas's opinion that Plaintiff suffers from an inadequately controlled seizure disorder is consistent with the medical evidence, the extreme functional limitations that he opines result from that disorder are not.  Plaintiff fails to cite any other medical records suggesting that he could not lift 10 pounds frequently or stand/walk for at least 2 hours per day.  To the contrary, he reported going on walks, shopping, and going to church 4 or 5 times per week.  AR 58-59, 198, 575.  Plaintiff fails to cite any other medical records suggesting that the symptoms of his depression and anxiety were so severe that he could not handle even low-stress work.  The ALJ cited records noting appropriate affect and no symptoms other than seizures.  AR 39, citing AR 631 and 707.  Thus, substantial

1 evidence supports the ALJ's finding of inconsistency.

2 Second, Plaintiff argues that Plaintiff's lack of medical compliance is not a legitimate reason to reject Dr. Thomas's MSS. (JS at 7.) As the ALJ noted (and as confirmed by the summary of Plaintiff's treating records above), Plaintiff consistently had subtherapeutic levels of anti-seizure medication in his blood whenever it was tested. Plaintiff therefore could not demonstrate that his seizure disorder would have caused functional limitations beyond those in the RFC even if he had taken his medications. AR 60 ("You can't say it's working or not working because you're not taking it every time. So we don't know what would happen if you took it all the time."). "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." Warre v. Comm'r of the SSA, 439 F.3d 1001, 1006 (9th Cir. 2006). Dr. Thomas assessed Plaintiff's functional limitations based on an inadequately controlled seizure disorder. AR 619. The ALJ could properly give his MSS little weight rather than crediting opinions assessing functional limitations that might not have existed if Plaintiff had been compliant with his prescribed medications.

Lastly, Plaintiff argues that even if his seizures could be controlled with medication, the ALJ should have credited Dr. Thomas's MSS, because Plaintiff's forgetfulness is a symptom of his mental impairments. (JS at 7.) Plaintiff does not point to any medical evidence that his memory was too impaired for him to manage his medical appointments and prescriptions. Based on testing, his memory was assessed as "fair," and his ability to remember simple instructions was within normal limits. AR 575-76. He displayed "normal" behavior, judgment, and thought content. AR 441, 547. Plaintiff could understand discussions with his doctor. AR 486. He answered questions posed by his doctors properly. AR 701. He lived with his mother, and she would remind him to take his medications. AR 59-60. None of his medical records reflect Plaintiff asking for help or strategies to remember his medication, such as using a special container or setting a kitchen

10

timer. Plaintiff has failed to demonstrate that he was too mentally impaired to remember to take his anti-seizure medications, such that Dr. Thomas's MSS reflects Plaintiff's highest level of potential functioning.

## IV.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner shall be AFFIRMED. Judgment shall be entered consistent with this order.

DATED: February 16, 2021

_____
KAREN E. SCOTT
United States Magistrate Judge